DAVID POWELL V. THE STATE OF TEXAS

NO. 07-00-0017-CR

IN THE COURT OF APPEALS

FOR THE SEVENTH DISTRICT OF TEXAS

AT AMARILLO

PANEL B

OCTOBER 5, 2000

______________________________

DAVID POWELL,

Appellant

v.

THE STATE OF TEXAS, 

Appellee

_________________________________

FROM THE 195
TH
 DISTRICT COURT OF DALLAS COUNTY;

NO. F99-02445-JN; HON. JOHN NELMS, PRESIDING

_______________________________

Before BOYD, C.J., and QUINN and JOHNSON, JJ.

David Powell (appellant) appeals his conviction for capital murder.  The three issues he asserts before us concern whether the trial court erred in admitting an unauthenticated letter into evidence, whether the testimony of an accomplice was corroborated in compliance with article 38.14 of the Code of Criminal Procedure, and whether the evidence was factually sufficient to prove appellant committed the offense of capital murder as alleged in the indictment.  We affirm.

Background

Appellant’s relationship with Jonathan Bishop (Deceased)

According to evidence appearing of record, appellant lived in Kansas for four years and then moved back to Dallas.  Soon after returning to Dallas, appellant sought to enter the drug business.  His efforts led to his contacting Jonathan Bishop (Bishop) whom he had known since ninth grade.  Testimony of record stated they were mostly acquaintances.

In March 1999, appellant and Bishop (along with two other persons) went to Brownsville to purchase less than 50 pounds of marijuana.  Once they were back in Dallas, Bishop asked appellant to help pay for the expenses of the trip, i.e., car rental, hotel, and payment made to driver.  The request for this money, coupled with appellant’s dissatisfaction with the quality of the marijuana, caused a rift to form between Bishop and appellant.  They stopped talking for awhile and began talking again right before Bishop’s

 death.  During the time they were not on speaking terms, Bishop mentioned to his girlfriend, Harmony Castio (Castio), that he wanted to burglarize, or have some of his friends burglarize, appellant’s home because he was mad that appellant did not want to help pay for the expenses.

Sometime later Bishop heard that appellant had some good marijuana.  Bishop told Castio he wanted to talk to appellant so they could conduct business again.  Three days before his death, Bishop told Jody Condor (Condor) that he and appellant were going to do another drug deal in a couple of days.  Condor replied that it was not a good idea for him to deal with appellant, especially since there were rumors that appellant wanted to kill him.  Bishop replied that he was not worried.  

On April 7
th
, the day of his death, Bishop also told Angel Calderon (Calderon), that he was going to embark on a new drug venture, but did not say with whom.  Calderon testified that he was also friends with appellant and that he had spoken with appellant after the Brownsville drug deal.  He stated that appellant was mad at Bishop and said he was “going to kill that m----r f----r.”  Calderon further stated that appellant was not a violent person.

On April 7
th
 at about 11:25 a.m. Bishop drove Castio to school and was supposed to pick her up at 2:40 p.m.  He never did. That afternoon, she and Bishop’s father called Bishop’s cell phone numerous times but never received a response.  The next day they found out he had been killed.

In their investigation, the police requested a register of calls made from Bishop’s cell phone.  The record showed that several calls were made on April 6
th
 and 7
th
, including a call made to appellant’s house on the 6
th
.  It also showed that Bishop made several calls on the 7
th
:  one to appellant’s house at 11:08 a.m.; one to appellant’s pager at 11:35 a.m.; two to Henry Zabanda at 11:40 a.m. and 12:32 p.m.; and two to Angel Calderon at 12:34 p.m. and 12:35 p.m.  Appellant testified that he did not speak with Bishop when these calls were made.

Appellant’s relationship with Danny Diaz (accomplice)

Appellant and Danny Diaz (Diaz) have known each other since eighth grade.  Appellant testified that they were very close friends.  Diaz lived at appellant’s home for a period of one to three months (there was conflicting testimony as to the exact duration).  Diaz then returned to live with his mother in Carrollton, Texas.  Appellant’s house was burglarized sometime after he came back from Brownsville.  Appellant testified that he was pretty certain Diaz was responsible for the burglary.  Diaz stated there were hard feelings between appellant and him because appellant accused Diaz of the burglary.  Diaz further testified that they had smoothed things over.  Appellant testified that he stopped believing it was Diaz because he found out who the real burglar was.

Appellant’s Testimony

Appellant testified there were no differences of opinion between Bishop and him and that he had allowed Diaz to borrow his car on April 7
th
.  He claimed that Diaz and the other co-defendant, Pete Salazar (Salazar) were setting him up to take the fall for a murder he took no part in.  In addition, he stated he never had a conversation with Calderon and never said he was going to kill anybody.  Appellant claimed to have been at home with a stomach virus on the day of the murder.  He also testified that Diaz had confessed to him that Salazar and he “had got into it with this guy and they. . .had to kill him.”  Appellant further declared that Diaz threatened to kill him if he told anyone what Diaz had related to him.

Point One – Admission of Unauthenticated Letter

In his first point of error, appellant claims the trial court erred in admitting an unauthenticated letter into evidence.  Before proceeding with our analysis, we find it important to relate how this letter came to be admitted.  A hearing outside the presence of the jury was held to determine the admissibility of a letter sent to Jamal Preston (Preston) by appellant while he was in jail.  In response to the State’s questioning, Preston stated he received a phone call from appellant while detained at Lew Sterrett Jail.  Preston asked appellant if he had killed Bishop.  Appellant denied it and said he would write him a letter explaining everything.  Preston later received a letter sent from the Lew Sterrett Jail.  At the hearing, the State offered the letter into evidence.  Defense counsel stated “no objection,” however, he asked to take the witness (Preston) on voir dire.  During voir dire, defense counsel asked Preston if he had ever received a letter prior to the present one from appellant to which he answered “no.”  Counsel asked if he could recognize appellant’s handwriting in any way.  Preston replied “I never knew his handwriting.”  Preston further stated he had no personal knowledge as to whether or not appellant had actually written that letter.  At the end of the voir dire, defense counsel objected on the grounds that the letter could have come from anybody.  In other words, the objection was based on the fact that the letter had not been properly authenticated as required by rule 901 of the Texas Rules of Evidence.  The trial court overruled appellant’s objection and admitted the letter into evidence.  

During appellant’s case-in-chief, appellant’s brother, on cross-examination, was presented with the letter and asked if he recognized the handwriting as that of appellant.  He replied “yes.”  On direct examination, appellant admitted writing the letter that Preston brought to the trial.

When a court has overruled an objection to evidence, the ruling usually will not be reversible error when the same evidence is subsequently admitted without objection, either before or after the complained-of ruling.  
Leday v. State
, 983 S.W.2d 713, 718 (Tex.Crim.App.1998).  This rule applies whether the other evidence was introduced by the defendant or the State.  
Id.; see, e.g., Rogers v. State
, 853 S.W.2d 29, 35 (Tex.Crim.App.1993); 
Stoker v. State
, 788 S.W.2d 1, 12 (Tex.Crim.App.1989), 
cert. denied
, 498 U.S. 951, 111 S.Ct. 371, 112 L.Ed.2d 333 (1990).  As a matter of fact, Texas follows the position requiring counsel to object every time the objectionable evidence is offered even if the court has indicated that such objection will be overruled.  
Leday v. State
, 983 S.W.2d at 718.

Here, appellant failed to renew his objection to the letter when the State cross-examined appellant’s brother, mentioned and presented the letter to the brother, and then asked whether he “recognize[d] [his] brother’s handwriting.”  In response to the latter question, appellant’s brother said “yes.”  As a result of this, we conclude that appellant either waived the purported error in question or that the error was harmless as per 
Leday
 and overrule the point.

Point Two – Corroboration of Accomplice Testimony

Through his second point of error, appellant alleges the State failed to comply with article 38.14 because it did not properly corroborate the testimony of Diaz, an accomplice.  When an accomplice to a crime testifies, article 38.14 requires his testimony to be corroborated by other evidence tending to connect the defendant with the offense committed.
  
Tex. Code Crim. Proc
. Ann. art. 38.14
 
(Vernon 1999).  If the corroboration merely shows the commission of the offense, then it is insufficient.  
Id
.  In addition, a conviction may not be had upon the testimony of an accomplice if no corroborating evidence has been presented or if there was insufficient corroborating evidence presented.  
Id.

The test for weighing the sufficiency of corroborative evidence under the accomplice witness rule requires us to eliminate from consideration the testimony of the accomplice witness and to examine the testimony of other witnesses in order to ascertain if there is evidence which 
tends to connect
 the accused with commission of the offense.  
Hernandez v. State
, 939 S.W.2d 173, 176 (Tex.Crim.App.1997) (emphasis added).  It is not necessary that the corroborating evidence directly connect the defendant to the crime or that it be sufficient by itself to establish guilt; it need 
only tend to connect
 the defendant to the offense.  
Cathey v. State
, 992 S.W.2d 460, 462 (Tex.Crim.App.1999) (emphasis added).  Furthermore, the “tend to connect” requirement is not reviewed under the standards of either legal or factual sufficiency of the evidence.  
Id.
  Under the accomplice witness rule, non-accomplice evidence need not be sufficient in itself to establish the accused’s guilt beyond a reasonable doubt.  
Hernandez
 
v. State
, 939 S.W.2d at 176.  

In the case at bar, the non-accomplice evidence consists of the testimony of various individuals.  First, the testimony of Castio, Calderon, and Condor tends to establish that appellant and Bishop were on bad terms due to a bad drug deal.  These witnesses also testified that there were rumors about appellant wanting to kill Bishop.  

Next, there is the testimony of Ivan Enriquez (Enriquez) which related what Salazar, a co-defendant, told Enriquez.  Enriquez’s testimony was admitted as a statement against interest of a co-defendant which is an exception to hearsay.  
Dewberry v. State
, 979 S.W.2d 871 (Tex.App.–Beaumont 1998, pet. ref’d).  Enriquez, who is the boyfriend of Salazar’s sister, testified that Salazar told him over the phone that “David (appellant) offered him either a pound of marijuana or some money for him to help him kill this guy.”  After the murder, Salazar visited Enriquez’s home and told him the details of how the murder took place.  Salazar said he and Diaz waited at Diaz’s house for appellant and Bishop to arrive.  Once they were all in the garage and the door was shut, they started beating Bishop.  They initially hit him with their fists but then they beat him with bats.  Salazar told Enriquez that Diaz could not stomach what they were doing and went inside the house.  Salazar further stated that appellant hit Bishop over the head with the bat and tried to strangle him with a speaker wire but, due to the amount of blood, his hands kept slipping.  At that point, Salazar stepped on Bishop’s throat.  They then proceeded to wrap the body in bags.  Salazar told Enriquez that appellant gave him $100 on the spot.  When Enriquez saw the newspaper article on Bishop’s murder, he asked Salazar if that was who they had killed.  Salazar said yes.  Two or three weeks later, Enriquez was present when Diaz went over to give Salazar $400.  Salazar was not home and Diaz told Enriquez the $400 was from appellant.

Moreover, the detectives investigating the case used a luminal (a device used to detect the presence of blood) in appellant’s vehicle and discovered the presence of blood in the left portion of the trunk.  The blood was tested and the DNA matched both Bishop’s and the blood found in Diaz’s garage.  The medical examiner’s testimony of Bishop’s injuries also corroborated the details Enriquez provided in his testimony as to the manner in which Bishop was killed.

Finally, the letter Preston received identified the exact location where Bishop’s car was found, even though the police did not tell appellant where it was recovered.  The letter accurately described the clothes Bishop was wearing on the day he was murdered.  The letter also asked Preston to commit perjury and instructed him as to what his affidavit should say.  Appellant’s letter said Preston would be paid nicely for helping him.

Based on the evidence described above, we find the state met its burden of corroborating Diaz’s testimony with other evidence.  The blood in appellant’s car, the details in the letter written by appellant, and the testimony previously discussed above constitute “some evidence tending to connect” the appellant to the commission of capital murder.  Therefore, we overrule the second point of error.

Point Three – Factual Sufficiency of Evidence

In his final point of error, appellant asserts the evidence presented at trial was factually insufficient.  A factual sufficiency review dictates that the evidence be viewed in a neutral light, favoring neither party.  
Johnson v. State
, 23 S.W.3d 1, 7 (Tex.Crim.App.2000).  Unless the available record clearly reveals a different result is appropriate, an appellate court must defer to the jury’s determination concerning what weight to give contradictory testimonial evidence because resolution often turns on an evaluation of credibility and demeanor, and those jurors were in attendance when the testimony was delivered.  
Id.
 at 8.  Evidence can be factually insufficient if 1) it is so weak as to be clearly wrong and manifestly unjust or 2) the adverse finding is against the great weight and preponderance of the available evidence.  
Id.
 at 11.  In other words, the complete and correct standard a reviewing court must follow to conduct a
 factual sufficiency review of the elements of a criminal offense asks whether a neutral review of all the evidence, both for and against the finding, demonstrates that the proof of guilt is so obviously weak as to undermine confidence in the jury’s determination, or the proof of guilt, although adequate if taken alone, is greatly outweighed by contrary proof.  
Id
. at 11.

In addition to the evidence previously mentioned in this opinion, the jury listened to the testimony of appellant’s mother, his brother, Joshua Smith (Smith) (appellant’s cell mate and previous cell mate of Diaz), and appellant.  Appellant and his family testified that appellant and his brother were home sick on April 7
th
.  Appellant’s mother claimed she only worked from noon to 2 p.m. on that day and was home the rest of the day with her two boys.  She also declared that Diaz came to her house around 11 a.m. that day.  

Patrick Powell (Powell), appellant’s brother, said Diaz was his best friend and that Diaz borrowed appellant’s car on the 7
th
 of April.  Powell further stated he visited Diaz in jail.  He denied showing Diaz a letter allegedly written by appellant trying to persuade him to put all the blame on Salazar.  Powell admitted he never told the police that Diaz borrowed appellant’s car the day of the murder.  He further acknowledged this was the first time he told anybody about it.

Smith and Diaz shared a cell for about two weeks.  Smith testified that Diaz told him that he and a friend were setting someone up for murder.  He stated that Diaz told him they had killed a guy by beating him with bats and stepping on his throat.  He also declared Diaz said the body had been dumped at a car wash near appellant’s house.  On cross-examination, Smith testified that he and appellant were presently “tankmates” and that appellant was bigger than Smith.

After fully reviewing all the evidence presented at trial in a neutral light, we do not find the evidence of guilt to be so weak as to be clearly wrong and manifestly unjust.  Nor do we find the proof of guilt to be greatly outweighed by contrary proof.  The case at bar involved contradictory testimony.  We must, therefore, defer to the jury’s determination as to the weight given to the testimonial evidence since the jurors were in a better position to evaluate the credibility and demeanor of the witnesses.  We hold the evidence to be factually sufficient and overrule appellant’s third point of error.

Accordingly, we affirm the judgment of the trial court.

Per Curiam.

Do not publish.